## No. 10,908.

### A. B. LEVY vs. D. C. McCAN.

1. In a suit for *extra* compensation of a clerk and book-keeper against his employer, where the proof discloses *false entries* in the defendant's books evidencing the employé's assent thereto, if unexplained and unsupported by confirmatory and satisfactory evidence, they create a strong presumption against the demand.

2. Instructions given to the employer's counsel to investigate such questioned entries, and make protest to the book-keeper against them, can not serve as the foundation of a charge of slander and libel or ground an action in damages against the employer.

APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

*W. S. Benedict* and *Lionel Adams* for Plaintiff and Appellant.

*Farrar, Jonas & Kruttschnitt* for Defendant and Appellee.

Levy vs. McCan.

The opinion of the court was delivered by

WATKINS, J. This is an action brought by a discharged clerk for balance of $11,400 as the amount due him on his salary for the full term of his contract of employment and for damages.

Plaintiff's claim is somewhat ambiguous and involved, but the substance of it is that on the 15th September, 1880, he was employed by the defendant as book-keeper, at a salary of $100 per month, but for the term of one year—the defendant being engaged in operating a foundry and iron works.

Soon after his said employment, Charles P. McCan, son of defendant, became a partner of his father in business, and the capital thereof was very largely increased, and the business, also, was increased and extended to the purchase of plantations, and the furnishing of supplies to sugar planters—whereby the labors of petitioner were greatly increased.

That during the time Charles P. McCan was a member of the firm, and prior to his death, he was the active man of the firm, and was chiefly intrusted with and responsible for its management and administration.

That after his death, on the 19th of September, 1886, the defendant requested him to take the place of his son in the conduct of the business, but simply as an employé—the transactions of the firm in liquidation aggregating many hundred thousands of dollars annually; and that defendant promised to pay him a compensation commensurate with the value of his services, over and above his *assured* salary, which was, at that time, $200 per month, to which he assented.

Under this arrangement plaintiff claims that the scope of his services was enlarged and extended, so as to embrace not only all of the various details of the foundry establishment, but to extend to all the receipts and disbursements thereof, and, also, to those of the defendant's several plantations, situated in different parts of the State —including the supervision of the laborers and lessees thereof, and the furnishing of them with plantation supplies.

Plaintiff specially avers that his said services continued from the 19th of September, 1886, until the 1st of January, 1890, when he was discharged by the defendant without sufficient cause or any serious ground of complaint.

34

He further avers that during the time he was so engaged, and prior to the date of his discharge, the defendant, "while frequently promising, failed to fix a *proper* remuneration for the service of petitioner outside of his regular line of duty as such book-keeper, and for the entire and active management and control of the property and business of the defendant;" but he further avers that, subsequently, on or about the 9th of August, 1889, the defendant gave him $300 on account of said extra services and authorized him to credit himself with $200 additional on that account, the remainder to be settled thereafter, and corresponding entries were made on the defendant's books.

He further avers that, in the fall of 1889, he demanded of defendant a settlement in the premises, and same was referred to defendant's counsel, who drew up a document wherein the amount of his salary was increased from $2400 per annum to $8000 per annum, "but same was so coupled with conditions that your petitioner did not feel that it was proper for him to sign, and he declined to sign same;" but, on the contrary, he expressed a willingness "to sign same *without such obnoxious conditions*, and defendant declined to abate said conditions."

Notwithstanding what had transpired, plaintiff represents that he continued his services until January 2, 1890, when, over his written and verbal protest and expressed desire to continue to perform his services, he was discharged from further employment by the defendant.

On the score of *extra services* the plaintiff claims the sum stated above; and, charging defendant to have slandered and defamed him by making and publishing as true a false statement to the effect that he had as book-keeper made false entries in his books in relation to the alleged agreement with petitioner, the latter claims and demands an additional $10,000 as damages for slander and libel.

The defendant's answer is full and explicit in detail, and we reproduce from his counsel's brief, at pages 10 and 11, the following careful synopsis of it, as the best mode of presenting his side of the case, viz. :

His entries in the defendant's book show "an admission that plaintiff was employed by defendant and by his firm of D. C. McCan & Son, and that the salary agreed to be paid to him prior to 1882, and which was paid to him in full, was at the rate of one hundred dol-

lars ($100) per month, which was duly and regularly paid to him
from month to month; that from January 1, 1882, to September
30, 1885, plaintiff's salary, fixed at $125 per month, was also duly
and regularly paid to him; that from October 1, 1885, to December
31, 1887, his salary, fixed at $150 per month, was also duly
and regularly paid to him; that from January 1, 1888, to January 1,
1890, his salary, fixed by agreement at $200 per month, was also
duly and regularly paid to him; and he avers that these salaries
were in full for all services rendered, and that no other agreement
was ever entered into between plaintiff and defendant or defend-
ant's firm or his deceased son concerning the salary of said Levy,
or any further compensation ever agreed to be paid to him for his
services as clerk or otherwise; that on or about the 10th of De-
cember, 1889, Levy informed respondent that in his opinion his
services had actually been worth to respondent far more than his
agreed salaries, and notified respondent that unless a material pe-
cuniary recognition of this claim were made he would leave re-
spondent's service on the 1st of January, 1890; that respondent posi-
tively and emphatically declined to do this, stating to said Levy
that throughout the term of his said engagement he had been at all
times at perfect liberty to resign his position if he had considered
the salary agreed upon and regularly paid as insufficient compensa-
tion for his services.   That Levy thereupon fully and unreservedly
admitted the legal correctness of respondent's position, and without
asserting that he had any legal claim upon respondent for past ser-
vices, or pretending that such claim existed, notified respondent
that he would withdraw from his service on the 1st of January, 1890;
that thereupon respondent, not wishing at that time to lose the ser-
vices of said Levy, requested him to name a salary for the single
year of 1890, which he (Levy) would consider not only a full com-
pensation for all services to be rendered during the year, but which
would likewise remove from his mind all dissatisfaction caused by
his belief that his agreed salary in the past had been insufficient;
that Levy thereupon suggested the sum of $8000, which respondent
assented to; that when the agreement was prepared on the 12th of
December, 1889, Levy refused to sign the same, and, refusing longer
to remain in the employment of respondent, voluntarily withdrew
therefrom on or about the 1st of January, 1890; that by this course
of action respondent's suspicions were excited, and he employed an

accountant to examine his commercial books, which had been kept solely by said Levy, and were exclusively under his control; that an investigation of said books thus made showed the following entries made therein in the handwriting of and by said Levy."

Thereto is appended a statement of the various entries upon the ledger and cash book that were kept by the plaintiff, exhibiting the proof of the amounts that were due him, on account of his salary during various years of his service.

Then follow quoted extracts from the same books of the alleged false entries made therein by plaintiff whilst he was in defendant's employ as book-keeper, and, as he (defendant) avers, wholly without his knowledge or consent, and in reference to plaintiff's claim for the extra services, and which are as follows, viz.:

1. "Cash book, at p. 244, July 31, 1888, is the following entry: A. B. Levy by D. C. McCan, balance July salary, *as agreed by the year*, from July 1, 1888, at $4800.

5. "In ledger, June 30, 1889, and in the cash book, June 30, 1889, is the following entry and contra-entry: A. B. Levy by D. C. McCan—*as agreed between A. B. Levy and D. C. McCan*. Credit for back wages from October 1, 1886, to June 30, 1888, *to compensate A. B. Levy* for *extra services* connected with the several plantations of the estate of C. P. McCan and D. C. McCan, as per contra-entry of this date, *$4950*.

6. "In the cash book, June 30, 1889, is the following entry: D. C. McCan to A. B. Levy. *Salary of $4800 per annum is hereby renewed* from June 30, 1889, for one year, *under the same conditions as those of July 31, 1888, as agreed between A. B. Levy and D. C. McCan, and in addition to said renewal D. C. McCan agreed to give the said A. B. Levy credit for back wages* from October 1, 1886, to June 30, 1888, *to compensate A. B. Levy for extra services* connected with the several plantations of the estate of C. P. McCan, and of the said D. C. McCan, *$4950*. And on a check stub No. 2409, of August 9, 1889, is the following entry: A. B. Levy, on account of accumulated salary to his credit to July 30, 1889, amounting to $7550, $300. And a similar entry appears in cash book, fo. 381." (Italic ours.)

The defendant refers to the foregoing entries as those he complains of as incorrect and not authorized, and to which he requested his counsel to direct the plaintiff's attention; at the same time deny-

ing that he ever, at any time, defamed or slandered him, though he denounced said entries to be false.

Defendant specifically denies any recognition or acknowledgment of the plaintiff's claim for extra services, and affirms that when he signed a check in favor of plaintiff in August, 1889, he was ignorant of the statement he subsequently ascertained was contained on the stub on said check book.

These comprehensive statements from the petition and answer narrow the controversy to a very small compass, and leave us practically nothing to do but settle one or two disputed questions of fact.

It is well to premise our discussion by the statement that plaintiff's petition concedes that, whatever may have been the course of his negotiations with the defendant, they never reached and perfected an agreement with relation to such extra services and no price therefor was ever agreed upon between them. His claim, therefore, must necessarily be upon the score of a *quantum meruit*, and not on a contract.

At the outstart we will further observe that while the plaintiff, in his petition, makes special reference to the disputed entries pointed out in the defendant's books, he seems to have done so for the *sole* purpose of supporting his charge of slander against the defendant; for, while he avers " that each and every of said entries so made as aforesaid on the books of safd firm   *   *   *   were so made *at the instance of said firm and said D. C. McCan by your petitioner*, then their employé, under their orders and directions," etc., yet there is neither statement or claim made in the petition to the effect that said entries furnish evidence of defendant's acknowledgment of his liability for the extra services claimed of him. For if said entries were indeed authorized by defendant, the claim of the plaintiff would be clearly and fully made out; but if they were false entries, made in the defendant's books by plaintiff, secretly and without the plaintiff's knowledge, they do not constitute evidence against the defendant at all, but, on the contrary, completely confound the plaintiff, as his case could not for a moment stand in the presence of such a palpable fraud on defendant.

But, when we consider the fact of plaintiff's failure to claim the full benefit of said *alleged true and correct entries* in the defendant's books, in verification of his claim; and, further, consider the fact

that he explicitly places reliance upon the written document that was prepared by the defendant's counsel, *alone,* as containing an admission of the value of his services—the conclusion becomes irresistible that he deems those entries unreliable as testimony, and puts the ban of distrust upon them.

The testimony of the plaintiff as a witness is equally equivocal and self-contradictory as his petition is—for he fixes an altogether different date in his evidence for the beginning and termination of his contract from that fixed in the ledger entries; and, instead of relying upon those entries as furnishing positive proof of the defendant's consent to pay a specified price of $200 per month additional for said extra services, his testimony places an altogether different interpretation upon the transaction, and shows, at most, that a *state* of *negotiation* existed at date of the conference that occurred at the law office of the defendant's counsel, which the testimony of *other* witnesses establishes, never matured or ripened into an *actual* agreement at all.

We quote, in this connection, the following from the plaintiff's testimony, viz.:

" After he had given me $200, and up to the 31st of December, 1889, *I frequently spoke to him about fixing up a definite amount, and he asked me how much I thought I ought to have.* I told him *$5000 a year was fair enough.* He says I will tell you what I will do; I will give you *$4800, $200 for plantations and $200 for the regular business,* and I said to him that I had lost time from the time that I had started in; and he says I will fix that for you; *and on July 1, 1888, he agreed to give me $4800 a year,* and in June, 1889, he told me I could credit myself with back wages from October, 1886, to June 30, 1889. Then I continued drawing that $200, and crediting myself to keep it straight, just as the books show there." R., p. 99.

*Vide* italicised paragraphs, particularly. *Per contra* we have the statement of the defendants' lawyer, who prepared the *projet* of agreement plaintiff's petition makes reference to—who, upon finding that his testimony was required, withdrew from the case—and from it we make the following pertinent extracts selected from his evidence touching the interview at his office, viz.:

" Mr. Levy then repeated in a very emphatic manner the sense of the injustice, or his sense of the injustice as he considered it, of Mr. McCan having employed him in a very responsible and difficult posi--

tion for many years without *proper* compensation. He stated that Mr. McCan time and again *promised* to make him some effectual recognition of those services by *an increase of salary* or otherwise, and that he had never done it, and had never kept his word." (Italics ours.)

Again:

" He stated that he had a number of conversations with Mr. McCan, and that Mr. McCan had *promised* to give him one-fourth of Promised Land, and that he had discussed giving him an interest in the foundry, but he said that he knew, as a matter of course, that verbal arrangements of that kind were not legal and were inoperative, and that 'I come here for the purpose of making arrangements that I knew would be legal and binding,' and I then said to him, 'Mr. Levy, before I discuss this thing, let me understand one thing—have you made, or have you pretended to have made, any arrangement which is *final and closed* with Mr. McCan in this connection?' and he said, '*I have not.*' I said, 'Very well, then, we are discussing this question absolutely as an *open question, and nothing has been done between you and Mr. McCan,, nothing has been said which you regard as final and binding or operative,' and he answered, ' That's the position which I occupy in this matter to-day.*' I said, ' In order that I might understand your position toward Mr. McCan, *what is your salary?' Mr. McCan and Mr. Levy answered simultaneously, Mr. McCan saying ' $200,' and Mr. Levy saying 'I am drawing $200.*' I said, very well, then I understand your position to be that Mr. McCan has been paying you a salary of $200, and that *you consider your salary is insufficient for the services which you have rendered to him*, and he says, ' Yes, that's it. I have taken the responsibility—a very heavy responsibility, I have worked incessantly, and have worked faithfully for Mr. McCan, and he has not paid me sufficiently.' " (Italics ours.)

This testimony clearly establishes the plaintiff's clear and distinct admission that there had not been, prior to that date, any agreement between him and the defendant; and the following shows just as conclusively that the *proposed* written agreement, in which it was stipulated that defendant should pay to the plaintiff $8000, related to *one year's services only*, and those services were to be *thereafter rendered*, and during the progress of the liquidation of the business of D. C. McCan & Son—viz.:

" Then it seemed as though there could be no agreement between them. *Mr. Levy* said, ' *Very well, I shall leave on the 1st of January; that's all there is about it.*' McCan seemed very much loath to have him quit. I then said to Mr. Levy, ' It seems to me that you might state some amount in dollars and cents, some round sum that would be satisfactory—some round sum that would not only be ample compensation to you for your services *for one year*,' and there was never any question of any engagement being made except for one year, ' which would not only be ample compensation for your services, and would *enable Mr. McCan to retain you during this liquidation*, but would also be sufficient to remove from your mind any sense of the injustice, as you claim it, that has been done to you, by *not having heretofore given you a sufficient salary* for your services.' He asked me to state an amount, which I declined to do, and after some hesitation he stated, as it were, tentatively: ' *Will you give me eight thousand* dollars ($8000)?' and before I could speak, Mr. McCan jumped up and said, ' Yes! ' evidently glad to have the tension of his mind relieved. They went out after a few unimportant words and I heard nothing more of it at that time."

It just as clearly appears from the foregoing that plaintiff proposed to discontinue his services after the 1st of January, 1890, unless the defendant consented to pay him additional compensation *during the year 1890.*

From all that has been disclosed by the preceding quotations from the pleadings and evidence, and from other evidence not quoted, but equally convincing and clear, we are satisfied the case is with the defendant on both branches of plaintiff's action.

The entries made in defendant's books were never known to or sanctioned by the defendant, and are wholly without efficacy to make proof of a contract.

The *projet* of argument discloses simply an incomplete compromise as to plaintiff's contemplated extra services to be thereafter rendered in 1890. There is no evidence to support a *quantum meruit* for years prior to 1890.

The defendant is an old and infirm person, possessed of large means, and who was evidently solicitous of retaining the plaintiff in his employment *during the liquidation* of the business of the firm during the year *1890*, consequent upon the death of his son and partner, and upon whose services the defendant placed a high estimation. It is

also evident that the plaintiff both saw and appreciated the advantage to himself of this situation, and had made up his mind to take all the advantage possible of it; and finding his scheme circumvented, he brought this suit in the hope of recouping the benefits of his unsuccessful negotiations.

It is our deliberate opinion that the plaintiff has no well founded claim for extra services, and *none whatever* for damages on the score of defamation of character and slander.

In the court below there was judgment for the defendant, and it is affirmed.

Rehearing refused.